UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RONALD FLORENCE,                    )      No. EDCV 08-0883-RC
                                    )
          Plaintiff,                )
                                    )      OPINION AND ORDER
     v.                             )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
          Defendant.                )
_____)

     Plaintiff Ronald Florence filed a complaint on July 10, 2008,

seeking review of the decision denying his application for disability

benefits.  On December 1, 2008, the Commissioner answered the

complaint, and the parties filed a joint stipulation on January 16,

2009.


                            **BACKGROUND**

                                **I**

     On March 12, 2003, plaintiff applied for disability benefits

under the Supplemental Security Income ("SSI") program of Title XVI of

the Act, 42 U.S.C. § 1382(a), claiming an inability to work since

1   October 1, 2002, due to blindness and headaches.  Certified

2   Administrative Record ("A.R.") 40-42, 59.  An administrative hearing

3   was held before Administrative Law Judge Bernard A. Trembly ("ALJ

4   Trembly") on October 1, 2004, A.R. 29, 164-82, and on February 15,

5   2005, ALJ Trembly found plaintiff is not disabled.  A.R. 7-14.  The

6   Appeals Council denied review, A.R. 3-6, and on October 19, 2005,

7   plaintiff filed his first federal court complaint: <u>Florence v.</u>

8   <u>Astrue</u>, EDCV 05-0954-RC ("Florence I").[1]  On July 23, 2007, this Court

9   granted plaintiff's request for relief and remanded the matter to the

10  Social Security Administration ("SSA") under sentence four of 42

11  U.S.C. § 405(g), A.R. 195-205, and the Appeals Council, in turn,

12  remanded the matter for an administrative hearing before

13  Administrative Law Judge F. Keith Varni ("the ALJ").  A.R. 206-08,

14  310-18.  On April 24, 2008, the ALJ found plaintiff is not disabled,

15  A.R. 183-94, and that decision is now before this Court.

16

17                              **II**

18      The plaintiff, who was born on June 27, 1959, is currently 50

19  years old.  A.R. 40, 167.  He is a high school graduate, and has

20  previously worked as a general laborer and an assistant manager at a

21  mobile home park.  A.R. 60, 65, 68-75, 167.

22

23      This Court, in its Florence I decision, summarized some of the

24  relevant medical evidence, as follows:

25  //

26

27      [1]  Pursuant to Fed. R. Evid. 201, this Court takes judicial

28  notice of relevant documents in Florence I.

2

1    The plaintiff was severely injured in an automobile accident
2    in May of 1979, sustaining injuries to his head, face, and
3    lower back, as well as losing his right eye.  [¶]  On
4    April 2, 2003, Lilian Chang, M.D., an internist, examined
5    plaintiff, noting his right eye was missing and finding
6    plaintiff's "[v]isual fields to confrontation are intact on
7    the left" with mildly decreased visual acuity on the left
8    and a pterygium with minimal encroachment on the left pupil.
9    The plaintiff's vision was determined to be 20/70 in his
10   left eye, without glasses, and 20/50, with pinhole
11   correction.  Additionally, Dr. Chang found plaintiff had
12   "mildly" decreased lumbar spine range of motion due to pain
13   and "mildly" decreased hearing bilaterally, although
14   plaintiff was able to carry out conversation within a normal
15   speaking distance.  Dr. Chang opined plaintiff: can lift and
16   carry 50 pounds occasionally and 25 pounds frequently; he
17   can stand and walk for at least 6 hours in an 8-hour work
18   day, and sit for 8 hours in an 8-hour work day; he can
19   frequently bend, stoop and crouch; he has "mild" visual
20   limitations; but he is not otherwise limited.  [¶]  On
21   July 29, 2003, Donald E. Shearer, M.D., examined plaintiff
22   and diagnosed him with an enucleated right eye, a pterygium
23   in the left eye, a left eye refractive error, and
24   presbyopia.  Dr. Shearer determined plaintiff's visual
25   acuity in his left eye is 20/60, without glasses, and 20/30,
26   with glasses.
27
28   Florence I at 2:21-4:2 (footnotes omitted; citations omitted).

On October 16, 2007, plaintiff had surgery to remove the pterygium from his left eye.  A.R. 295-303.  On January 17, 2008, Dr. Shearer reexamined plaintiff, and diagnosed him with an enucleated right eye, with ball implant, and a left eye recurrent pterygium, as well as corneal scarring from excision of the pterygium, with uncorrected vision of 20/70 in his left eye and best possible correction 20/40.  A.R. 236-40.

Additionally, plaintiff has received some psychiatric evaluations and treatment.  Between April 14, 2000, and November 22, 2002, while plaintiff was in prison, a staff psychiatrist diagnosed plaintiff with unspecified depression, noting plaintiff's wife had recently died, and determined plaintiff's Global Assessment of Functioning ("GAF") was 60.[2]  A.R. 114.  Subsequently in 2000, plaintiff was "doing well" -- with no depression, anxiety or other psychiatric problems.  A.R. 112. On May 4, 2001, J. Howlin, Ed.D., a staff psychologist, diagnosed plaintiff with a depressive disorder, noting plaintiff was concerned about his parole.  A.R. 111.  Plaintiff was subsequently prescribed Wellbutrin[3] to treat his depression.  Id.  On August 16, 2001, a staff

_____

[2]  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

[3]  "Wellbutrin . . . is given to help relieve certain kinds of major depression.  [¶] . . . Unlike the more familiar tricyclic antidepressants, such as Elavil, Tofranil, and others, Wellbutrin tends to have a somewhat stimulating effect."  The PDR Family Guide to Prescription Drugs, 737 (8th ed. 2000).

physician examined plaintiff, who was requesting Wellbutrin, and found plaintiff had no psychiatric diagnosis and "malingering" should be ruled out.  A.R. 108.  On September 12, 2001, plaintiff stated he had no complaints and was not depressed.  A.R. 106.  On May 7, 2002, Dennis C. Olson, Ph.D., a staff psychologist, examined plaintiff and found he was alert and oriented, and not psychotic or suicidal but was worried, and diagnosed plaintiff with an unspecified psychotic disorder and hallucinogen dependence in early full remission (provisional).  A.R. 99.

On April 12, 2003, Suzanne Dupee, M.D., a psychiatrist, examined plaintiff and diagnosed him with a history of alcohol dependence in full, sustained remission and cannabis abuse or dependence, and determined plaintiff's GAF was 70-75.[4]  A.R. 130.  Dr. Dupee opined plaintiff, who was homeless at the time, appeared to be having significant social problems, but not psychiatric problems, and he had no impairment in his ability to: understand, remember, and carry out detailed and complex or simple one or two-step instructions; relate and interact with supervisors, coworkers, and the public; maintain

---

[4]  A GAF of 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships[,]" American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000), while a GAF of 71-80 indicates "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Id.

concentration, attention, persistence, and pace; associate with day-to-day work activity, including attendance and safety; adapt to the stresses common to a normal work environment, including attendance and safety; and maintain regular attendance in the workplace and perform work activities on a consistent basis.  A.R. 126-31.

On June 27, 2007, D. Durant-Wilson, a psychologist, examined plaintiff and diagnosed him as having a bipolar 1 disorder, most recent episode hypomanic, and cannabis abuse, noted plaintiff had been prescribed Depakote,[5] and opined plaintiff remained psychologically stable during his incarceration at the California Rehabilitation Center.  A.R. 257-59.  Plaintiff continued to receive outpatient treatment on parole.  A.R. 243-56, 261-81.

On January 8, 2008, Linda M. Smith, M.D., a psychiatrist, examined plaintiff and diagnosed him with polysubstance abuse, possibly abstaining, and determined his GAF was 85.[6]  A.R. 224-35. Dr. Smith found plaintiff was not a credible historian, was "vague and evasive," and "highly manipulative," opining:

---

[5]   Among other uses, "Depakote . . . [is] used to control the manic episodes — periods of abnormally high spirits and energy — that occur in bipolar disorder (manic depression)."  The PDR Family Guide to Prescription Drugs, 194 (8th ed. 2000).

[6]   A GAF of 85 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

1     [Plaintiff] attempted to be falsely ingratiating at times
2     and he attempted flattery at times.  He was normally
3     animated and he gestured normally.  He appeared to often be
4     carefully gauging how I was responding to him and then he
5     would shift what he was saying in response.  This all
6     depended on how I behaved and this was very manipulative.
7     He was superficially cooperative.  He was able to volunteer
8     information spontaneously.  There was no psychomotor
9     agitation or retardation.  He did not appear to be genuine
10    and truthful.  There did appear to be substantial evidence
11    of exaggeration and attempting to maneuver around my
12    questions, etc.  None of the interview actually appeared to
13    be very credible.

14

15  A.R. 224-25, 228.  Dr. Smith determined that plaintiff has no mental
16  disorder, but has "drug seeking" behavior for Wellbutrin, stating:

17

18    There certainly is no evidence of bipolar disorder, no
19    evidence of [post-traumatic stress disorder] and no evidence
20    of any psychosis.  There is a long criminal history often
21    related to substance abuse.  In his prison records he often
22    has no problem at all even off medication, but when he does
23    want medication it is always Wellbutrin and nothing else
24    with a lot of drug seeking behavior for Wellbutrin; this is
25    a drug of abuse in prison.  He frequently smiled and laughed
26    and joked throughout the interview.  He generally took the
27    tack of being flattering and ingratiating to me today.  He
28    says he is no longer using drugs.  He probably does have

1    antisocial personality traits with the level of manipulation

2    and his criminal background, etc., but I do not believe he

3    would be impaired in his ability to work from a psychiatric

4    standpoint if he gave a fair effort.

5

6    A.R. 230-31.  Thus, Dr. Smith found plaintiff was not impaired in his

7    ability to:  understand, remember or complete simple or complex

8    commands; interact appropriately with supervisors, co-workers, or the

9    public; comply with job rules such as safety and attendance; respond

10   to changes in the normal workplace setting; and maintain persistence

11   and pace in a normal workplace setting.  A.R. 231-35.

12

13                              **DISCUSSION**

14                                 **III**

15       The Court, pursuant to 42 U.S.C. § 405(g), has the authority to

16   review the decision denying plaintiff disability benefits to determine

17   if his findings are supported by substantial evidence and whether the

18   Commissioner used the proper legal standards in reaching his decision.

19   Sam v. Astrue, 550 F.3d 808, 809 (9th Cir. 2008) (per curiam); Vasquez

20   v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008).

21

22       "In determining whether the Commissioner's findings are supported

23   by substantial evidence, [this Court] must review the administrative

24   record as a whole, weighing both the evidence that supports and the

25   evidence that detracts from the Commissioner's conclusion."  Reddick

26   v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Holohan v. Massanari,

27   246 F.3d 1195, 1201 (9th Cir. 2001).  "Where the evidence can

28   reasonably support either affirming or reversing the decision, [this

                                    8

Court] may not substitute [its] judgment for that of the Commissioner." <u>Parra v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 1068 (2008); <u>Vasquez</u>, 547 F.3d at 1104.

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  "The claimant bears the burden of establishing a prima facie case of disability." <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1122 (1996); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289 (9th Cir. 1996).

The Commissioner has promulgated regulations establishing a five-step sequential evaluation process for the ALJ to follow in a disability case.  20 C.F.R. § 416.920.  In the **First Step**, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 416.920(b).  If not, in the **Second Step**, the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities.  20 C.F.R. § 416.920(c).  If so, in the **Third Step**, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1.  20 C.F.R. § 416.920(d).  If not, in the **Fourth Step**, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work.  20 C.F.R. § 416.920(f).

1  If not, in **Step Five**, the burden shifts to the Commissioner to show

2  the claimant can perform other work that exists in significant numbers

3  in the national economy.   20 C.F.R. § 416.920(g).

4

5      Moreover, where there is evidence of a mental impairment that may

6  prevent a claimant from working, the Commissioner has supplemented the

7  five-step sequential evaluation process with additional regulations.

8  Maier v. Comm'r of the Soc. Sec. Admin., 154 F.3d 913, 914 (9th Cir.

9  1998) (per curiam).   First, the ALJ must determine the presence or

10 absence of certain medical findings relevant to the ability to work.

11 20 C.F.R. § 416.920a(b)(1).   Second, when the claimant establishes

12 these medical findings, the ALJ must rate the degree of functional

13 loss resulting from the impairment by considering four areas of

14 function: (a) activities of daily living; (b) social functioning; (c)

15 concentration, persistence, or pace; and (d) episodes of decompensa-

16 tion.   20 C.F.R. § 416.920a(c)(2-4).   Third, after rating the degree

17 of loss, the ALJ must determine whether the claimant has a severe

18 mental impairment.   20 C.F.R. § 416.920a(d).   Fourth, when a mental

19 impairment is found to be severe, the ALJ must determine if it meets

20 or equals a Listing.   20 C.F.R. § 416.920a(d)(2).   Finally, if a

21 Listing is not met, the ALJ must then perform a residual functional

22 capacity assessment, and the ALJ's decision "must incorporate the

23 pertinent findings and conclusions" regarding the claimant's mental

24 impairment, including "a specific finding as to the degree of limita-

25 tion in each of the functional areas described in [§ 416.920a(c)(3)]."

26 20 C.F.R. § 416.920a(d)(3), (e)(2).

27

28     Applying the five-step sequential evaluation process, the ALJ

found plaintiff has not engaged in substantial gainful activity since

his alleged application date, March 12, 2003.  (Step One).  The ALJ

then found plaintiff has "a severe bilateral ocular impairment with

enucleation in the right eye and [a] history of substance abuse[,]"

but his mental impairment is not severe,[7] (Step Two); and he does not

have an impairment or combination of impairments that meets or equals

a Listing.  (Step Three).  The ALJ next determined plaintiff has no

past relevant work.  (Step Four).  Finally, the ALJ determined

plaintiff can perform a significant number of jobs in the national

economy; therefore, he is not disabled.  (Step Five).


**IV**

     The Step Two inquiry is "a de minimis screening device to dispose

of groundless claims."  Smolen, 80 F.3d at 1290; Webb v. Barnhart,

433 F.3d 683, 687 (9th Cir. 2005).  Including a severity requirement

at Step Two of the sequential evaluation process "increases the

efficiency and reliability of the evaluation process by identifying at

an early stage those claimants whose medical impairments are so slight

that it is unlikely they would be found to be disabled even if their

age, education, and experience were taken into account."  Bowen v.

Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119

(1987).  However, an overly stringent application of the severity

requirement violates the Act by denying benefits to claimants who meet

the statutory definition of disabled.  Corrao v. Shalala, 20 F.3d 943,

---

     [7]  In reaching this conclusion, the ALJ found plaintiff "has
no limitation in activities of daily living, social functioning,
[and] concentration, persistence or pace . . . [and] has
experienced no episodes of decompensation."  A.R. 189.

1  949 (9th Cir. 1994).

2

3       A severe impairment or combination of impairments within the

4  meaning of Step Two exists when there is more than a minimal effect on

5  an individual's ability to do basic work activities.  Webb, 433 F.3d

6  at 686; Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001); see

7  also 20 C.F.R. § 416.921(a) ("An impairment or combination of

8  impairments is not severe if it does not significantly limit [a

9  person's] physical or mental ability to do basic work activities.").

10 Basic work activities are "the abilities and aptitudes necessary to do

11 most jobs," including physical functions such as walking, standing,

12 sitting, lifting, pushing, pulling, reaching, carrying or handling, as

13 well as the capacity for seeing, hearing and speaking, understanding,

14 carrying out, and remembering simple instructions, use of judgment,

15 responding appropriately to supervision, co-workers and usual work

16 situations, and dealing with changes in a routine work setting.

17 20 C.F.R. § 416.921(b); Webb, 433 F.3d at 686.

18

19      The ALJ found plaintiff does not have a severe mental impairment.

20 A.R. 189.  However, plaintiff contends this finding is not supported

21 by substantial evidence because the ALJ failed to properly consider

22 the opinion of psychologist Dr. Olson.

23

24      Dr. Olson examined plaintiff on May 7, 2002, and opined plaintiff

25 had an unspecified psychotic disorder and determined plaintiff's GAF

26 was 55.  A.R. 99.  Dr. Olson found plaintiff was "alert, oriented,

27 worried, not psychotic and not suicidal."  Id.  The ALJ did not

28 specifically address Dr. Olson's opinion that plaintiff's GAF was 55,

1  which, as noted above, indicates "moderate symptoms."  Rather, the ALJ

2  reviewed all of plaintiff's records, and concluded plaintiff does not

3  have a severe mental impairment.  A.R. 189, 191-92.

4

5       A GAF score reflects "the clinician's judgment of the

6  individual's overall level of functioning" regarding only psycholog-

7  ical, social and occupational functioning, and not considering

8  physical or environmental limitations.  American Psychiatric Ass'n,

9  Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed.

10 (Text Revision) 2000); Langley v. Barnhart, 373 F.3d 1116, 1122-23

11 n.3 (10th Cir. 2004).  However, without more, the ALJ's assessment of

12 the medical record is not deficient solely because it does not

13 reference a particular GAF score.  Howard v. Comm'r of Soc. Sec.,

14 276 F.3d 235, 241 (6th Cir. 2002); see also Howard v. Barnhart,

15 341 F.3d 1006, 1012 (9th Cir. 2003) ("[I]n interpreting the evidence

16 and developing the record, the ALJ does not need to 'discuss every

17 piece of evidence.'" (citations omitted)); Ramos v. Barnhart,

18 513 F. Supp. 2d 249, 261 (E.D. Pa. 2003) ("Clinicians use a GAF scale

19 to identify an individuals' [sic] overall level of functioning, and a

20 lower score 'may indicate problems that do not necessarily relate to

21 the ability to hold a job.'"  (citation omitted)); 65 Fed. Reg. 50746,

22 50764-65 ("The GAF scale . . . does not have a direct correlation to

23 the severity requirements in our mental disorder listings.").  This is

24 particularly true in this case since nothing in the substance of Dr.

25 Olson's note shows plaintiff suffered from any impairment in his

26 ability to perform basic work activities.  A.R. 99.  Rather, the brief

27 note indicates plaintiff was considered to be alert, oriented and not

28 psychotic or suicidal, id., and in the mental health visit prior to

Dr. Olson's examination, plaintiff denied any psychiatric complaints, depression or hallucinations, and he was not taking any psychiatric medication.  Moreover, Dr. Olson's report was issued well before plaintiff claimed to have a disability.  See A.R. 40 (alleging plaintiff became disabled as of October 1, 2002); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.").  On the other hand, substantial evidence, including the opinions of examining psychiatrists Drs. Dupee and Smith, support the ALJ's determination that plaintiff does not have a severe mental impairment.  See, e.g., Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (examining physician's medical report based on independent examination of claimant constitutes substantial evidence to support ALJ's disability determination).  Thus, there is no merit to this claim.[8]

## V

A claimant's residual functional capacity ("RFC") is what he can still do despite his physical, mental, nonexertional, and other limitations.  Mayes, 276 F.3d at 460; Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  Here, the ALJ found plaintiff has the RFC "to perform a full range of work at all exertional levels" limited only by monocularity.  A.R. 189.  However, plaintiff contends this finding is not supported by substantial evidence because the ALJ

---

[8]  This is true whether Dr. Olson is considered to be a treating physician or examining physician.  In the Court's opinion, however, he is an examining physician since the records show he saw plaintiff one time.  See A.R. 99.

1    improperly determined plaintiff was not a credible witness and

2    erroneously failed to consider the testimony of plaintiff's

3    girlfriend.

4

5         **A.  Credibility:**

6         At the first administrative hearing, plaintiff testified he does

7    not work because he cannot see, stating "I can't read that sign right

8    there unless I look right down the bridge of my nose."  A.R. 169, 173.

9    The plaintiff also complained his knees are "messed up[,]" every time

10   he bends over, his eyes water and his back "wrenches up[,]" he has a

11   dry mouth, he experiences seizures, and he gets headaches three or

12   four times a month, lasting from between a couple of hours to three

13   days.  A.R. 169, 172.  The plaintiff also stated he experiences neck

14   and back pain, ringing in his ears, and sinus pressure.  A.R. 82.

15

16        Once a claimant has presented objective evidence he suffers from

17   an impairment that could cause pain or other nonexertional limita-

18   tions,[9] the ALJ may not discredit the claimant's testimony "solely

19   because the degree of pain alleged by the claimant is not supported by

20   objective medical evidence."  Bunnell v. Sullivan, 947 F.2d 341, 347

21   (9th Cir. 1991) (en banc); Moisa v. Barnhart, 367 F.3d 882, 885 (9th

22   Cir. 2004).  Thus, if the ALJ finds the claimant's subjective

23   complaints are not credible, he "'must provide specific, cogent

24   reasons for the disbelief.'"  Greger v. Barnhart, 464 F.3d 968, 972

25   _____

26        [9]  "While most cases discuss excess pain testimony rather
     than excess symptom testimony, rules developed to assure proper
27   consideration of excess pain apply equally to other medically
     related symptoms."  Swenson v. Sullivan, 876 F.2d 683, 687-88
28   (9th Cir. 1989).

(9th Cir. 2006) (citations omitted); <u>Orn</u>, 495 F.3d at 635.  If there is medical evidence establishing an objective basis for some degree of pain and related symptoms, and no evidence affirmatively suggesting that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  <u>Morgan v. Comm'r of the Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999); <u>Carmickle</u>, 533 F.3d at 1160.

Here, the ALJ found plaintiff was not credible for several reasons, including plaintiff's "infrequent and sporadic treatment," and lack of medical treatment between July 29, 2003, and March 2005.  A.R. 190, 304-09.  Clearly, "[t]he ALJ is permitted to consider lack of treatment in his credibility determination."  <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005); <u>Batson v. Comm'r of the Soc. Sec. Admin.</u>, 359 F.3d 1190, 1196 (9th Cir. 2004); <u>see also</u> <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989) ("[A]n unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's . . . testimony.").

The ALJ also found that, despite plaintiff's complaint of "constant head pain and pain in his back, treatment records reflect that the use of pain medication is limited to occasional consumption of mild analgesics with no evidence that treatment should be any more aggressive."  A.R. 192.  Moreover, the ALJ found "there is no evidence that [plaintiff's] complaints of symptoms are not adequately controlled with medication without any reported side effects."  <u>Id.</u>  These, too, are proper bases for the ALJ's adverse credibility

1  determination.   See Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir.

2  2001) (noting lack of adverse side effects in rejecting claimant's

3  excess pain testimony); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.

4  1999) (Claimant's "claim that she experienced pain approaching the

5  highest level imaginable was inconsistent with the 'minimal,

6  conservative treatment' that she received.").

7

8      Furthermore, with respect to plaintiff's complaints of difficulty

9  reading, the ALJ found that the physicians who have evaluated

10  plaintiff's vision have concluded that "while the [plaintiff] does

11  have severe ocular impairments, he has adequate visual fields and

12  overall visual efficiency."  A.R. 190-92.   This finding also supports

13  the ALJ's adverse credibility determination.   See Matthews v. Shalala,

14  10 F.3d 678, 680 (9th Cir. 1995) (substantial evidence supported

15  finding claimant could do a narrow range of medium work where no

16  examining physician concluded claimant was totally disabled); Harper

17  v. Sullivan, 887 F.2d 92, 96-97 (5th Cir. 1989) (substantial evidence

18  supported ALJ's conclusion claimant's complaints were not credible

19  when "[n]o physician stated that [the claimant] was physically

20  disabled").

21

22      Additionally, the ALJ properly found that Dr. Smith's

23  determination that plaintiff was not credible, A.R. 191, 193,

24  supported his own adverse credibility determination, see, e.g.,

25  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) ("In

26  assessing the claimant's credibility, the ALJ may use 'ordinary

27  techniques of credibility evaluation,' such as considering the

28  claimant's reputation for truthfulness and any inconsistent statements

17

in her testimony." (citation omitted)); <u>Anderson v. Barnhart</u>, 344 F.3d 809, 815 (8th Cir. 2003) (ALJ properly considered psychologist's opinion that claimant was manipulative in making adverse credibility determination), as does the ALJ's finding that plaintiff's "history of incarceration," which included a theft conviction, showed lack of honesty or credibility.  A.R. 193; <u>see also</u> A.R. 127, 227.  <u>Albidrez v. Astrue</u>, 504 F. Supp. 2d 814, 822 (C.D. Cal. 2007); <u>see also</u> <u>Ellison v. Astrue</u>, 2008 WL 4425764, *4 (C.D. Cal.) (ALJ properly considered claimant's theft conviction since "[p]ast conduct involving dishonesty is relevant to a determination of a [claimant's] credibility.").

In short, "[t]he ALJ's reasons for his [adverse] credibility determination were clear and convincing, sufficiently specific, and supported by substantial evidence." <u>Celaya v. Halter</u>, 332 F.3d 1177, 1181 (9th Cir. 2003); <u>Thomas</u>, 278 F.3d at 959.

**B.  Lay Witness Opinion:**

Plaintiff next contends the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider a third-party questionnaire plaintiff's girlfriend completed, in which she indicated plaintiff: lives alone in a tent; has headaches, neck and back pain; has difficulty shaving because he cannot see; and cannot read because he cannot see.[10]  A.R. 88-93.

//

---

[10]   Ms. Burke, the girlfriend, testified at the first administrative hearing, A.R. 175, 179-80, but plaintiff does not challenge the ALJ's assessment of this testimony.  Jt. Stip. at 8:9-10:12, 11:9-24.

1    There is no merit to this claim since the ALJ did consider the

2  third-party information, but found it was less credible than the

3  medical evidence and opinions, A.R. 192-93, and this is a germane

4  reason for rejecting the girlfriend's information.  See, e.g., Greger,

5  464 F.3d at 972 (ALJ gave germane reasons for doubting claimant's

6  former girlfriend's testimony, including that it was inconsistent with

7  the medical evidence); Lewis, 236 F.3d at 511 ("One reason for which

8  an ALJ may discount lay testimony is that it conflicts with medical

9  evidence.").

10

11                                    V

12    At Step Five, the burden shifts to the Commissioner to show the

13  claimant can perform other jobs that exist in the national economy.

14  Hoopai v. Astrue, 499 F.3d 1071, 1074-75 (9th Cir. 2007); Widmark,

15  454 F.3d at 1069.  To meet this burden, the Commissioner "must

16  'identify specific jobs existing in substantial numbers in the

17  national economy that [the] claimant can perform despite her

18  identified limitations.'"  Meanel, 172 F.3d at 1114 (quoting Johnson,

19  60 F.3d at 1432).  There are two ways for the Commissioner to meet

20  this burden: "(1) by the testimony of a vocational expert, or (2) by

21  reference to the Medical Vocational Guidelines ["Grids"] at 20 C.F.R.

22  pt. 404, subpt. P, app. 2."[11]  Tackett v. Apfel, 180 F.3d 1094, 1099

23

24    [11]  The Grids are guidelines setting forth "the types and
    number of jobs that exist in the national economy for different
25  kinds of claimants.  Each rule defines a vocational profile and
    determines whether sufficient work exists in the national
26  economy.  These rules represent the [Commissioner's]
    determination, arrived at by taking administrative notice of
27  relevant information, that a given number of unskilled jobs exist
    in the national economy that can be performed by persons with
28

(9th Cir. 1999); Widmark, 454 F.3d at 1069.  However, "[w]hen [the Grids] do not adequately take into account [a] claimant's abilities and limitations, the Grids are to be used only as a framework, and a vocational expert must be consulted."  Thomas, 278 F.3d at 960; Widmark, 454 F.3d at 1069.

Hypothetical questions posed to a vocational expert must consider all of the claimant's limitations, Thomas, 278 F.3d at 956; Lewis, 236 F.3d at 517, and "[t]he ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."  Tackett, 180 F.3d at 1101.  Here, the ALJ asked vocational expert Joseph Mooney the following hypothetical question:

> I'd like you to consider a person of the claimant's background.  He is still a younger individual for [S]ocial [S]ecurity disability purposes.  The record indicates he does have a [twelfth] grade education.  Consider that there is no past relevant work.  Also consider that there are no exertional limits and work is possible at any exertional level, consider that the claimant is monocular and since he has no past relevant work let's restrict the work to that which is unskilled, entry level, [specific vocational preparation] two.  Within that entire constellation of capacities and limits is there any unskilled work that can be performed?

each level of residual functional capacity."  Chavez v. Dep't of Health & Human Servs., 103 F.3d 849, 851 (9th Cir. 1996) (citations omitted).

A.R. 315-16.   The vocational expert responded that there would be a

broad range of jobs that the claimant could perform, including

cleaners, housekeepers and warehouseman.   A.R. 316.


    The plaintiff contends, however, that the hypothetical question

is incomplete, and the Step Five determination, thus, is not supported

by substantial evidence because the hypothetical question did not

include plaintiff's alleged inability to read and Dr. Olson's GAF of

55.   Jt. Stip. at 16:9-17:14, 18:11-13.   This argument is without

merit.   Since the ALJ's adverse credibility determination of both

plaintiff and his girlfriend is supported by substantial evidence, the

hypothetical question to the vocational expert did not have to include

their self-serving statements that plaintiff is unable to read.[12]   See

Greger, 464 F.3d at 973 (9th Cir. 2006) ("The ALJ . . . 'is free to

accept or reject restrictions in a hypothetical question that are not

supported by substantial evidence.'" (quoting Osenbrock, 240 F.3d at

1164-65)); Copeland v. Bowen, 861 F.2d 536, 540 (9th Cir. 1988)

_____

    [12]   Moreover, since substantial evidence supports the ALJ's
rejection of plaintiff's testimony and Ms. Burke's evidence that
plaintiff cannot read, plaintiff has not identified any conflict
between the vocational expert's testimony and the Dictionary of
Occupational Titles, see Massachi v. Astrue, 486 F.3d 1149, 1153
(9th Cir. 2007) (In evaluating a vocational expert's testimony,
"the ALJ must first determine whether a conflict exists.   If it
does, the ALJ must then determine whether the vocational expert's
explanation for the conflict is reasonable and whether a basis
exists for relying on the expert rather than the [DOT]."), and
any possible error in the ALJ failing to ask the vocational
expert about possible conflicts was harmless.   Id. at 1154 n.19;
see also Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007)
("[T]he ALJ's error in failing to ask the vocational expert about
possible conflicts between his testimony and the Dictionary of
Occupational Titles was harmless, since no such conflict appears
to exist.").

("[E]xclusion of some of a claimant's subjective complaints in questions to a vocational expert is not improper if the [Commissioner] makes specific findings justifying his decision not to believe the claimant's testimony about claimed impairments such as pain."). Further, as noted above, the ALJ properly found plaintiff does not have a severe mental impairment, and Dr. Olson's opinion did not set forth any limitation more severe than included in the hypothetical question to the vocational expert.  Thus, "[t]he hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record. The ALJ's reliance on testimony the VE gave in response to the hypo-thetical therefore was proper."  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175-76 (9th Cir. 2008)

**ORDER**

     IT IS ORDERED that: (1) plaintiff's request for relief is denied; and (2) the Commissioner's decision is affirmed, and Judgment shall be entered in favor of defendant.


DATE:  July 1, 2009           /S/ ROSALYN M. CHAPMAN
                             ROSALYN M. CHAPMAN
                             UNITED STATES MAGISTRATE JUDGE

R&R-MDO\08-0883.mdo
7/1/09